COURT OF APPEALS
DECISION
DATED AND FILED

November 17, 2020

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2018AP902-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2015CF410

IN COURT OF APPEALS
DISTRICT I

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

LEROY STANTON, JR.,

DEFENDANT-APPELLANT.

APPEAL from a judgment and orders of the circuit court for Milwaukee County: THOMAS J. McADAMS and MARK A. SANDERS, Judges. *Affirmed*.

Before Brash, P.J., Donald and White, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM. Leroy Stanton, Jr. appeals a judgment of conviction, following a jury trial, of one count of second-degree sexual assault and one count of substantial battery. Stanton also appeals the postconviction orders denying his motion for relief on the basis of ineffective assistance of counsel.[1] Upon review, we affirm.

## BACKGROUND

¶2     On January 23, 2015, Stanton was charged with one count of second-degree sexual assault and one count of substantial battery. According to the criminal complaint, the charges stemmed from allegations that Stanton forced oral sex on S.G. without her consent and then beat her when she called him a rapist and tried to escape him.

¶3     The matter proceeded to trial where multiple witnesses testified. S.G. testified that on January 16, 2015, she went to her friend B.H.'s home for a small party. Stanton, with whom S.G. had a previous sexual relationship but had not seen in years, was also present at the party. S.G. testified that throughout the night, Stanton flirted with her and at one point asked her to have sex with him. S.G. testified that when just a few party guests remained, B.H. retired to her bedroom. S.G. testified that Stanton made her go with him to an empty back room of the house, where he again began to ask her to have sex with him. S.G. "kept telling him no." S.G. testified that Stanton then pinned her against the wall, pulled

---

[1] The Honorable Thomas J. McAdams entered the judgment of conviction. The Honorable Mark A. Sanders entered the postconviction orders denying Stanton's motion for relief.

down her pants and underwear, got on his knees, and licked her vagina. S.G. testified that she continued to tell him no and tried to push him away.

¶4 S.G. further testified that Stanton grabbed her legs, causing her to fall, and he continued to perform oral sex on her. S.G. testified that she struggled underneath Stanton, but that at some point, Stanton stood up. S.G. testified that she stood up as well, but that Stanton blocked her exit until Stanton "reached over to get something" and then she was able to leave the room. S.G. testified that she escaped into a hallway, called Stanton a "raper," and threatened to call the police. S.G. testified that Stanton caught up with her and pushed her, causing her to fall into a bathroom, where Stanton repeatedly hit her, causing injury. S.G. further testified that B.H.'s daughter saw Stanton hit S.G., told her mother, and B.H. came out from her room to find Stanton on top of S.G. S.G. testified that Stanton told B.H. that S.G. was "playing with [him]," to which S.G. responded, "you know I said no[.]" Shortly after that, Stanton left the house and S.G. called the police. S.G. also testified that she went to the hospital to treat her injuries, where she was examined by a sexual assault nurse examiner.

¶5 Milwaukee Police Officer Scott Strong testified that he responded to S.G.'s call and arrived at B.H.'s home to find S.G. "with a bloody rag held to her head." Strong testified that S.G. was shaken up when he arrived at B.H.'s home and that S.G. identified Stanton as the source of her injuries. Strong testified that S.G. told him that Stanton forced nonconsensual oral sex. Strong testified that S.G. stated she was able to escape the room where Stanton was performing oral sex when he tripped on a mattress, allowing her to run out of the room. Strong further testified that S.G. said that Stanton then caught her and beat her.

¶6      Sharain Horn, a sexual assault and domestic violence nurse specialist, testified about the general procedures of sexual assault examinations. Horn testified that she did not personally examine S.G., but that she reviewed S.G.'s medical records.[2]   Horn read and paraphrased a portion of the examining nurse's January 17, 2015, report that described S.G.'s disclosures to the nurse who examined her:

> Patient reports being sexually assaulted by Godkid's uncle on 1/16/2015 around 10:00 to 11:00 p.m.  Patient reports mouth-to-vagina assault and physical assault when—and this is in quotes—"he got mad because I didn't want to have sex with him," end quote.  Patient reports assailant, in quotes also, "grabbed me."  Patient motioned to her neck, and she, in quotes, "slid my hand under and got away," end quote.  Patient reports assailant hit her head with his hands and caused the injuries to her face.  Patient reports falling and hitting her head on the tub after being hit.  Stated—and this is also in quotes—"acted like I was dead," end quote.
>
>      All options of care were explained.  Patient requested evidence collection and consented to exam of areas of assault with photo documentation.  And then there's just a note that patient declined to give some details of assault due to pain and completing report with police just prior to SACT visit.

(Multiple sets of quotation marks omitted.)

¶7      B.H. testified that on the night of her party, Stanton, her daughter's uncle, was pursuing S.G., but that S.G. did not tell Stanton she was not interested. B.H. testified that she left the party to put her child to bed.  B.H. testified that she later came out of her room when her daughter told her that Stanton and S.G. were fighting.  B.H. testified that she went to the bathroom, where she saw S.G. lying

---

[2] The nurse examiner who examined S.G. following the assault was on medical leave at the time of trial.

on the floor bleeding and Stanton standing in the hallway. B.H. testified that Stanton said that he "went down on" S.G. but that S.G. suddenly said "no" and told Stanton to stop.

¶8      Milwaukee Police Officer Amy Stolowski testified that she was dispatched to B.H.'s home in the early morning hours following B.H.'s party. Stolowski testified that she interviewed B.H., who told her that Stanton was making advances towards S.G. all throughout the party. Stolowski testified that B.H. said that later in the evening, she and her daughter emerged from their rooms after hearing a yell for help and that B.H. then found Stanton on top of S.G. in the bathroom. Stolowski also testified that she did not receive any information suggesting that S.G. consented to sexual contact with Stanton.

¶9      The jury found Stanton guilty as charged. The trial court sentenced Stanton to twenty-eight years of incarceration on the sexual assault charge, bifurcated as eighteen years of initial confinement and ten years of extended supervision, and three years of incarceration on the substantial battery charge, bifurcated as one year of initial confinement and two years of extended supervision.

¶10      Stanton filed a postconviction motion, arguing, as relevant to this appeal, that trial counsel was ineffective for failing to: (1) introduce the results of certain DNA testing at trial; (2) cross-examine S.G. on her testimony that she escaped Stanton when he reached for something, which was inconsistent with her report to Strong that Stanton tripped on the mattress; and (3) object to the admission of portions of the sexual assault nurse examination report (the SANE report) as a confrontation clause violation. As support for the DNA claim, Stanton attached a report from an expert who reviewed the DNA test results in this case.

The expert concluded that (1) amylase, a presumptive marker for saliva, was detected on S.G.'s underwear and external genitalia; (2) no male DNA was detected on the external genitalia; (3) a very low level of male DNA was found on the interior crotch of the underwear and Stanton was excluded as a contributor; and (4) testing found a mixture of at least four individuals' DNA profiles on the exterior waistband of the underwear, from which Stanton and S.G. could neither be included nor excluded.

¶11     The postconviction court partially denied the motion, finding the inconsistency in S.G.'s testimony to be too minor to affect the outcome of trial and finding that neither the SANE report nor the corresponding testimony were testimonial.  The court granted a ***Machner***[3] hearing on Stanton's DNA claim.

¶12     At the ***Machner*** hearing, Stanton's trial attorney, Eamon Guerin, testified that he reviewed a DNA report prior to trial but that "this was always a consent case."  Guerin testified that, accordingly, he did not think that DNA evidence was relevant because it was undisputed that a sex act had occurred. Guerin testified that Stanton was to testify, but that Stanton changed his mind mid-trial, effectively devastating the theory of defense.

¶13     Stanton also testified at the hearing, telling the postconviction court that he denied admitting to Guerin that he had sexual contact with S.G.

¶14     The postconviction court denied the remainder of Stanton's motion, finding that DNA evidence would have been unnecessary to support a consent defense and that Stanton "torpedoed" Guerin's defense strategy by choosing not to

---

[3] *See **State v. Machner***, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

testify. The court found that Stanton could not establish deficient performance or prejudice. This appeal follows.

## DISCUSSION

¶15 On appeal, Stanton contends that the postconviction court erroneously denied his postconviction motion on all three ineffective assistance of counsel issues. We disagree.

¶16 In *State v. Allen*, 2004 WI 106, 274 Wis. 2d 568, 682 N.W.2d 433, the Wisconsin Supreme Court reviewed the standard applied when defendants assert that they are entitled to a postconviction evidentiary hearing on the issue of ineffective assistance of counsel:

> First, [courts] determine whether the motion on its face alleges sufficient material facts that, if true, would entitle the defendant to relief. This is a question of law that [appellate courts] review *de novo.* If the motion raises such facts, the [trial] court must hold an evidentiary hearing. However, if the motion does not raise facts sufficient to entitle the movant to relief, or presents only conclusory allegations, or if the record conclusively demonstrates that the defendant is not entitled to relief, the [trial] court has the discretion to grant or deny a hearing.

*Id.*, ¶9 (emphasis added).

¶17 A claim of ineffective assistance requires the defendant to show that his or her attorney's performance was deficient as well as prejudicial to his or her defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To prove deficient representation, a defendant must point to specific acts or omissions by counsel that are "outside the wide range of professionally competent assistance." *Id.* at 690. To satisfy the prejudice prong, a defendant must demonstrate that counsel's deficient performance was "so serious as to deprive the defendant of a fair trial, a

7

trial whose result is reliable." *Id.* at 687. In other words, there must be a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. We need not address both aspects of the test if the defendant fails to make a sufficient showing on either one. *See id.* at 697.

¶18 Here, the postconviction court denied two of Stanton's claims without a hearing. The court found that any inconsistency in S.G.'s testimony regarding her escape method was too minor to affect the outcome of trial and that there was no confrontation clause violation with regard to either the SANE report or the corresponding testimony.

¶19 As to the inconsistency in S.G.'s testimony, we agree with the State that how S.G. escaped from Stanton was not a fact of consequence. Whether S.G. escaped when Stanton "reached over to get something," as she told the jury, or when Stanton tripped on a mattress, as Strong testified, does not undermine the abundance of other evidence supporting Stanton's conviction. The jury heard from a number of witnesses regarding the events leading up to the assault, the details of the assault itself, the aftermath, and S.G.'s injuries. The jury, as the ultimate arbiter of witness credibility and evidentiary weight, found the evidence sufficient to convict Stanton. *See State v. Poellinger*, 153 Wis. 2d 493, 501, 503-04, 451 N.W.2d 752 (1990). Accordingly, nothing in the record supports overturning the jury's findings.

¶20 As to whether counsel should have objected to the SANE report and the corresponding testimony, we agree with the postconviction court that the admission of the evidence did not amount to a confrontation clause violation.

¶21    The confrontation clause is implicated by the admission of out-of-court statements that are "testimonial," a determination made by applying the primary purpose test. *State v. Mattox*, 2017 WI 9, ¶32, 373 Wis. 2d 122, 890 N.W.2d 256. Under that test, "the dispositive 'question is whether, in light of all the circumstances, viewed objectively, the "primary purpose" of the [out-of-court statement] was to creat[e] an out-of-court substitute for trial testimony.'" *Id.* (alteration in original; citations omitted). When a "statement's primary purpose is something other than to 'creat[e] an out-of-court substitute for trial testimony[,]' its admission does not implicate the Confrontation Clause." *Id.*, ¶3 (first alteration in original; citations omitted).

¶22    Under the primary-purpose test, courts weigh factors to determine whether a statement is testimonial, including: "(1) the formality/informality of the situation producing the out-of-court statement; (2) whether the statement is given to law enforcement or a non-law enforcement individual; (3) the age of the declarant; and (4) the context in which the statement was given." *Id.*, ¶32 (footnote omitted).

¶23    We note first that the State points out that whether a victim's statements to a sexual assault nurse examiner are testimonial is not settled law. Where the law is unsettled, counsel does not perform deficiently by failing to challenge it. *State v. McMahon*, 186 Wis. 2d 68, 84, 519 N.W.2d 621 (Ct. App. 1994). We could end our analysis here, however, for purposes of completeness we conclude that neither the SANE report nor Horn's testimony were testimonial under the facts of this case.

¶24    Horn testified that a SANE exam "is guided by national protocol for the care of sexual assault victims" and that its primary purpose is to provide the

victim with medical treatment and safety. The exam in this case was conducted by a medical professional, who follows particular protocols in interviewing and examining patients. Horn testified that the information obtained during an exam is completely dependent upon the amount of information the victim is willing to provide. The exams are not conducted by law enforcement officials, but rather by medical professionals trained to treat sexual assault victims. Given the totality of the circumstances, we conclude that the SANE report was not testimonial. Accordingly, there was no confrontation clause violation.

¶25    We also conclude that there was no confrontation clause violation with regard to Horn's testimony despite the fact that Horn did not conduct S.G.'s examination. Unlike cases in which Wisconsin courts have found confrontation clause violations, Horn did not act as a conduit for another expert's opinion. *See State v. Williams*, 2002 WI 58, ¶25, 253 Wis. 2d 99, 644 N.W.2d 919. Indeed, neither Horn nor the examining nurse provided any opinions at all. Horn simply testified as to sexual assault examination procedures and then read statements S.G. made to the examining nurse. Nothing in those details conveyed any independent conclusions or opinions on which Stanton would have needed the ability to cross-examine the examining nurse. Accordingly, there was no confrontation clause violation.

¶26    Finally, we agree with the postconviction court that Stanton cannot demonstrate ineffective assistance of counsel for Guerin's failure to introduce DNA evidence.

¶27    Stanton concedes that Guerin had a reasonable trial strategy for not introducing the DNA evidence at the beginning of trial, but contends that counsel should have introduced the evidence after Stanton elected not to testify. In

essence Stanton contends that Guerin failed to adjust the trial strategy after he chose not to testify. The DNA evidence, Stanton contends, would have cast doubt on S.G.'s contention that oral sex occurred.

¶28 At the *Machner* hearing, Guerin testified the theory of defense was consent, thereby rendering any DNA evidence unnecessary. Guerin testified that Stanton's sudden mid-trial decision not to testify significantly weakened the theory of defense, but still did not render the DNA evidence necessary. We agree with the postconviction court that any prejudice Stanton *may* have suffered resulted from his own decision to unilaterally change the theory of defense once the trial was well underway. Moreover, even if counsel had adjusted the theory of defense and introduced the DNA evidence, we are not convinced that the outcome of the trial would have been different because the DNA results were inconclusive. As relevant to this appeal, the lab report attached to Stanton's postconviction motion stated that:

> Amylase, a presumptive marker for saliva, was detected on the underwear … [and] external genitalia[.] However, the presumptive presence of saliva does not say anything about whom it might have come from.
>
> ….
>
> A very low level of male DNA was detected on the interior crotch of the underwear.... Leroy Stanton is excluded as a contributor to the Y-chromosome profile.
>
> The DNA profiles from the exterior waistband of the underwear were mixtures from at least 4 individuals. Complex mixtures of 4 individuals can be difficult to interpret. Neither Leroy Stanton nor [S.G.] could be included nor excluded as contributors
>
> In addition to semen, blood and saliva which can be identified or indicated, skin cells, and body fluids on the hands (saliva, mucus or tears) can all be the source of human DNA.

¶29    The lab report does not eliminate the possibility that S.G. was the victim of a sexual assault committed by Stanton. Accordingly, Stanton cannot demonstrate that the results of his trial would have been different had counsel introduced this DNA evidence.

¶30    For the foregoing reasons, we affirm the trial court.

*By the Court.*—Judgment and orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5. (2017-18).