STATE of Wisconsin, Plaintiff-Respondent,

v.

Tarence A. BANKS, Defendant-Appellant.

Court of Appeals

*No. 2009AP1436–CR. Submitted on briefs April 8, 2010.
—Decided July 21, 2010.*

**2010 WI App 107**

(Also reported in 790 N.W.2d 526.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Scott D. Obernberger* of Law Office of *Scott D. Obernberger, LLC*, Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Marguerite M. Moeller*, assistant attorney general, and *J.B. Van Hollen*, attorney general.

Before Brown, C.J., Anderson and Snyder, JJ.

¶ 1. SNYDER, J. Tarence A. Banks appeals from a judgment of conviction that followed a jury verdict of guilty on two charges: possession of a firearm by a felon and resisting or obstructing an officer. He further appeals from an order denying his motion for postcon-

viction relief. Banks contends that he received ineffective assistance of counsel, that the circuit court failed to properly count prior convictions of a witness for the State, and that the testimony against Banks at trial was insufficient to support the conviction. We agree that Banks received ineffective assistance of counsel and reverse. We hold that Banks is entitled to a new trial and remand for further proceedings.

## BACKGROUND

¶ 2. On April 25, 2007, Racine police officers Michael Ditscheit and Christopher Blackmore were on patrol and noticed a green van with expired license plates. The officers noted three black males wearing black hooded sweatshirts in the van. The officers activated their emergency lights and "blipped the siren a couple times." The van initially pulled over, but then pulled away and continued moving forward. It did the same maneuver again and the officers then advised dispatch that they were in pursuit. Ditscheit recalled the van failing to obey two stop signs and reaching speeds of up to forty miles per hour in a residential area with a twenty-five mile per hour speed limit.

¶ 3. Ditscheit then observed a person jump out of the van through the passenger side sliding door. Blackmore took up the chase on foot. With the assistance of other officers in the area, Blackmore tracked the fleeing person to a house. When he approached the house, the resident was pointing at a person on his porch and yelling, "[G]et this guy off my porch; I don't know who this man is." There was a black hooded sweatshirt on the ground near the porch and the man was sweaty and breathing heavily. Blackmore recognized the man on the porch as Jimmie Green and placed him under arrest.

¶ 4. Meanwhile, a citizen informed Ditscheit that a man walking down another street had come out of the van. Ditscheit was able to stop the man and identify him as Michael Ozier.

¶ 5. Ditscheit then learned from another officer that a gun had been found nearby. The gun was in a residential backyard near a fence, and was placed under some bricks with the handle visible. Another officer, Jessie Nethery, testified that she found the gun, that it appeared the bricks were used to try to hide the weapon, and that the only footprints near the gun appeared to be Jimmie Green's.

¶ 6. Officer Joseph Bialkowski testified that he was assisting in the search for occupants of the van when he came upon a man wearing black clothing, perspiring, and breathing heavily. He identified the man as Banks and took him into custody.

¶ 7. During the ensuing investigation, police officers interviewed Banks, Green, and Ozier. At a pretrial suppression hearing, the officers described the interviews as follows. Robin Jacobsen, a retired Racine police officer, testified that he had met Banks in the police department interview room, where he informed Banks of the reason for his detention and the allegations that had been made by the officers at the scene. He then began reading the police department form advising Banks of his *Miranda*[1] rights. Banks told Jacobsen that he would not sign the form and would not talk without an attorney present. As Jacobsen prepared to leave the interview room, Banks asked a question about the allegations. Jacobsen explained that the situation had to do with a green van that had fled from police and also a gun that had been found. Banks then,

---

[1] *Miranda v Arizona*, 384 U.S. 436 (1966).

on his own, made a statement to Jacobsen regarding his reason for being in the area that night. After Banks made the statement, he then told Jacobsen he did not want to say anything else without an attorney. Jacobsen left the room.

¶ 8. Banks also testified at the suppression hearing, acknowledging that he knew his constitutional rights. He stated that Jacobsen did not end the interview when Banks requested an attorney; rather, Jacobsen tried to reread the form to him and then asked "two times" more whether Banks wanted to talk. Banks testified that he had told Jacobsen during the interview that he had been coming from his cousin Sarah's house when he was approached and detained by police.

¶ 9. The circuit court found that Jacobsen read Banks his constitutional rights and that the statement made by Banks was not prompted by interrogation. The court found that when Banks indicated he would not sign the waiver form, Jacobsen was going to leave but was drawn back by a question from Banks. Consequently, the court held that Banks' statement was voluntary and spontaneous and therefore would not be suppressed.

¶ 10. Ozier testified at trial and relayed the following version of events. He stated that he was driving the van and had picked up Green, who sat up front, and Banks, who sat in the back. When police initiated the traffic stop, Ozier began to pull over but Green told him to "go, go, go," and he pulled away. Green jumped out of the van while Ozier and Banks stayed inside until Ozier parked in an alley. Ozier asserted that he did not know about a gun and did know whether Green or Banks had one while in the van. On the stand, Ozier confirmed that he had five prior criminal convictions.

¶ 11. Green also testified. His version of events differed somewhat from Ozier's; most importantly, he provided additional information about the gun. Green stated that Banks had a gun in the van and when the police attempted the traffic stop, Banks threw the gun into Green's lap. When he ran away from the van, Green dropped the gun as he tried to jump a fence.

¶ 12. Green also testified that while he was in jail, Banks sent him a letter. Green construed the letter as a request not to testify against Banks. He explained that, in the letter, Banks called him a "cut throat" and cast other aspersions, and stated "what's understood need not be talked about." Green wrote a letter back to Banks, but did not state he would refuse to testify. While on the stand, Green acknowledged that he had five prior criminal convictions. Prior to Green's testimony, the circuit court had determined that two additional criminal convictions would not be counted for impeachment purposes because sentencing in those matters was still pending.

¶ 13. During its case-in-chief, the State asked two officers about the collection of DNA evidence from Banks during the investigation. Blackmore testified that he was able to obtain DNA samples from Ozier and Green without incident, but that Banks would not voluntarily submit a sample. Officer Todd Morschhauser also testified that Ozier and Green were cooperative during his investigation. Morschhauser indicated, however, that he had to "enlist[] assistance" from another police officer and "several sheriff's deputies" to try to obtain a DNA sample from Banks. Morschhauser testified that he prepared a search warrant which allowed him to "eventually" obtain the sample; he explained, "After I read the search warrant to [Banks] he voluntarily gave me a DNA swab."

¶ 14. After a two-day trial, the jury returned verdicts of guilty on both charges. Banks filed a motion for postconviction relief, asserting that he had received ineffective assistance of counsel, that the court made erroneous rulings on the admission or suppression of evidence, and that there was insufficient evidence to support the verdicts. After several hearings on the motion, the court denied it in its entirety. Banks appeals.

## DISCUSSION

¶ 15. Banks renews all three of his postconviction arguments and offers four reasons for his claim of ineffective assistance of counsel. He asserts that (1) his attorney failed to sufficiently voir dire the jury after learning that the potential jurors were making racial comments, (2) his attorney failed to seek a jury instruction advising the panel that all interrogations of felony suspects must be recorded, (3) his attorney failed to object to testimony indicating that Banks did not cooperate in providing a DNA sample, and (4) his attorney improperly disclosed the letter that Green sent to Banks from jail. Banks further argues that the circuit court erred when it failed to count all seven of Green's prior convictions for impeachment purposes. Finally, he argues that Green's testimony, which the State relied on to obtain a conviction, was insufficient to support the verdict.

*Ineffective Assistance of Counsel*

¶ 16. To establish an ineffective assistance of counsel claim, a defendant must show both that counsel's performance was deficient and that he was

777

prejudiced by the deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). A reviewing court may dispose of a claim of ineffective assistance of counsel on either ground. *Id.* at 697. We review the denial of an ineffective assistance claim as a mixed question of fact and law. *State v. Johnson*, 153 Wis. 2d 121, 127, 449 N.W.2d 845 (1990). We will not reverse the circuit court's factual findings unless they are clearly erroneous. *Id.* However, we review the two-pronged determination of trial counsel's performance independently as a question of law. *Id.* at 128.

¶ 17. We first ask whether counsel's representation was deficient. The test for deficient performance is an objective one that asks whether counsel's performance was objectively reasonable under prevailing professional norms. *State v. Kimbrough*, 2001 WI App 138, ¶ 31, 246 Wis. 2d 648, 630 N.W.2d 752. Banks asserts several grounds for reversal due to ineffective assistance of counsel. We begin with his assertion that failure to object to testimony and argument regarding Banks' refusal to voluntarily submit to DNA testing amounted to ineffective assistance.

¶ 18. The Fourth Amendment guarantees the right to be secure against unreasonable searches and seizures. It is undisputed that requiring a defendant to provide a blood sample for DNA analysis constitutes a Fourth Amendment search. *See Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 616–18 (1989) (concluding that the taking of a blood, urine, or breath sample constitutes a search under the Fourth Amendment). Warrantless searches are per se unreasonable

under the Fourth Amendment. *See* U.S. Const. amend. IV; *State v. Jones*, 2005 WI App 26, ¶ 9, 278 Wis. 2d 774, 693 N.W.2d 104.

¶ 19. Banks asserts that the State violated his constitutional rights when it suggested that the jury should draw an adverse inference from Banks' refusal to voluntarily submit to the DNA test before the search warrant was presented. He further argues that his trial attorney was ineffective for failing to object. At trial, the State elicited testimony about Banks refusing to voluntarily submit a DNA sample on at least two occasions through different law enforcement witnesses. Then, during closing argument, the prosecutor encouraged the jury to draw a negative inference:

> They then interviewed the parties, Michael Ozier, Jimmie Green, and finally Tarence Banks. Michael Ozier was cooperative, Jimmie Green was cooperative, Tarence Banks lied. He declined to give a DNA sample to the officers that day.
>
> Officer Blackmore secured the DNA sample from both Michael Ozier and from Jimmie Green that day. [Banks] only agreed to give a DNA sample to Investigator Morschhauser when Investigator Morschhauser got a search warrant, got other officers and sheriff's deputies and basically told [Banks] that one way or another we're gonna get a DNA sample.
>
> And why would he not give a sample? Ladies and gentlemen, I submit to you it was because his DNA might have been on that gun, and because he was the one that tossed the gun from the back of the van to the front into Jimmie Green's lap . . . .

¶ 20. Banks directs us to *Griffin v. California*, 380 U.S. 609, 614 (1965), for the proposition that it is unconstitutional to create an inference against a defen-

779

dant simply for exercising a constitutional privilege. *Griffin* addressed the right of the accused to choose not to testify at trial. *Id.* The court explained, "What the jury may infer, given no help from the court, is one thing. What it may infer when the court solemnizes the silence of the accused into evidence against him is quite another." *Id.* More recently, the United States Supreme Court took up a defendant's right to remain silent and stated, "Where the prosecutor on his own initiative asks the jury to draw an adverse inference from a defendant's silence, *Griffin* holds that the privilege against compulsory self-incrimination is violated." *United States v. Robinson*, 485 U.S. 25, 32 (1988). Banks draws the analogy that the State cannot imply that a defendant who refuses to voluntarily submit a DNA sample, absent a warrant, has done something incriminating. To allow the implication would penalize Banks for exercising his constitutional right under the Fourth Amendment.

¶ 21. The State argues that the law on whether a prosecutor may comment on an accused's exercise of his or her Fourth Amendment right to refuse a warrantless DNA request is unsettled in Wisconsin. Nonetheless, the State acknowledges a broad cross-section of cases interpreting the Fourth Amendment in a manner consistent with Banks' position here. The State concedes, "[T]here is a substantial body of case law holding that it is improper for the Government to comment on an accused's exercise of his Fourth Amendment right to refuse to consent to a search." It then provides eight examples of case law, from Alaska in 1971 to Minnesota in 2008, wherein courts concluded that the prosecutor may not comment on the defendant's failure to consent to a warrantless search.[2]

---

[2] The State provides the following examples: *Bargas v. State*, 489 P.2d 130, 132–33 (Alaska 1971) ("It would make

¶ 22. The State emphasizes, however, that no Wisconsin appellate court has yet spoken on the precise issue. The State directs us to *State v. Maloney*, 2005 WI 74, ¶ 23, 281 Wis. 2d 595, 698 N.W.2d 583, for the rule that "an attorney is not liable for an error of judgment on an unsettled proposition of law." Consequently, the State argues, "The absence of any Wisconsin case law deciding this issue is fatal to Banks' claim that his attorney was guilty of deficient performance in failing to object" to the testimony or the closing argument.

¶ 23. The State's argument disregards the fact that Wisconsin has conformed its interpretation of constitutional search and seizure provisions to the United States Supreme Court's Fourth Amendment jurisprudence. *See State v. Fry*, 131 Wis. 2d 153, 175–76, 388 N.W.2d 565 (1986). Wisconsin has consistently followed federal law in search and seizure cases to define the scope of protected rights and to deter the impingement of those rights.[3] As observed in *Fry*: "[C]onforming Wisconsin's

---

meaningless the constitutional protection against unreasonable searches and seizures if the exercise of that right were allowed to become a badge of guilt."); *see also Padgett v. State*, 590 P.2d 432, 434 (Alaska 1979); *Gomez v. State*, 572 So.2d 952, 953 (Fla. App. 1990); *People v. Stephens*, 349 N.W.2d 162, 163–64 (Mich. App. 1984); *State v. Jones*, 753 N.W.2d 677, 687 (Minn. 2008); *Sampson v. State*, 122 P.3d 1255, 1261–62 (Nev. 2005); *Garcia v. State*, 712 P.2d 1375, 1376 (N.M. 1986); *Commonwealth v. Welch*, 585 A.2d 517, 519–20 (Pa. Super. Ct. 1991).

[3] Our supreme court has consistently interpreted article I, section 11 of the Wisconsin Constitution to provide the same constitutional guarantees as the United States Supreme Court has accorded through its interpretation of the Fourth Amendment. *State v. Ferguson*, 2009 WI 50, ¶ 17 n.6, 317 Wis. 2d 586, 767 N.W.2d 187. On only one occasion in the development of article I, section 11 jurisprudence has Wisconsin required a

search and seizure law to that developed by the Supreme Court under the [F]ourth [A]mendment is not only consistent with the text of Wisconsin's search and seizure provision, its constitutional history and its judicial history, but it is also in accord with sound public policy." *Id.*

■

¶ 24. Furthermore, it is a violation of the defendant's right to due process for a prosecutor to comment on a defendant's failure to consent to a warrantless search. *See United States v. Runyan*, 290 F.3d 223, 249 (5th Cir. 2002) ("[T]he circuit courts that have directly addressed this question have unanimously held that a defendant's refusal to consent to a warrantless search may not be presented as evidence of guilt."); *see, e.g., United States v. Moreno*, 233 F.3d 937, 940–41 (7th Cir. 2000); *United States v. Dozal*, 173 F.3d 787, 794 (10th Cir. 1999). It has long been a tenet of federal jurisprudence that a defendant's invocation of a constitutional right cannot be used to imply guilt:

> I can think of no special circumstances that would justify use of a constitutional privilege to discredit or convict a person who asserts it. The value of constitutional privileges is largely destroyed if persons can be penalized for relying on them. It seems peculiarly incongruous and indefensible for courts which exist and act only under the Constitution to draw inferences of lack of honesty from invocation of a privilege deemed worthy of enshrinement in the Constitution.

---

showing different from that required by the United States Supreme Court's Fourth Amendment jurisprudence. It did so in regard to the development of a good faith exception. *Id.* (citing *State v. Eason*, 2001 WI 98, 245 Wis. 2d 206, 629 N.W.2d 625, which created two additional requirements for law enforcement before according a good faith exception to their reliance on a defective no-knock search warrant).

*Grunewald v. United States*, 353 U.S. 391, 425–26 (1957) (Black, J., concurring).

■

¶ 25. Accordingly, when the State introduced testimony regarding Banks' refusal to voluntarily submit a DNA sample, Banks' attorney should have challenged the evidence. When the State commented on Banks' refusal during closing, suggesting his refusal demonstrated consciousness of guilt, Banks' attorney should have objected. The test for deficient performance is an objective one that asks whether trial counsel's performance was objectively reasonable under prevailing professional norms. *Kimbrough*, 246 Wis. 2d 648, ¶ 31. Here, it was not.[4]

---

[4] Although the State does not specifically argue that it has the right to collect a DNA sample from an arrestee without a warrant, we observe that fourteen states have enacted statutes that authorize some form of this practice. *See* John D. Biancamano, *Arresting DNA: The Evolving Nature of DNA Collection Statutes and their Fourth Amendment Justifications*, 70 OHIO ST. L.J. 619, 659 (2009).

> DNA databases . . . currently hold the DNA profiles of over five million people. Statutes requiring convicted persons to provide DNA samples have arisen in one form or another in every state. Challenges to these statutes have uniformly failed, however, fourteen states now require certain groups of arrestees to submit their DNA as well. The legal challenges to these laws have not provided much case law as of yet, but as DNA technology becomes more and more capable of exposing highly personal information, our experience should guide us to believe that a line must be drawn somewhere.

*Id.* at 659–60. The questions associated with the collection of DNA from arrestees arise from specific state statutes enabling the warrantless search. Wisconsin has no statute providing for the collection of DNA from arrestees. Nothing in our review of this emerging debate in other states suggests that the law in Wisconsin is unsettled. Accordingly, Banks' attorney was not

¶ 26. Because we conclude that there was deficient performance, we must also determine whether the deficiency was prejudicial. *See Strickland*, 466 U.S. at 687. To meet the prejudice test, Banks must demonstrate that his counsel's deficient performance was "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *See id.* In other words, there must be a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

¶ 27. Banks was convicted on one count of possession of a firearm by a felon, contrary to WIS. STAT. § 941.29(2). At trial, the State called several law enforcement witnesses, none of whom had personally observed Banks with the gun. There was conflicting testimony from Ozier and Green, who had both been in the van with Banks immediately prior to the foot chase and discovery of the gun. The only direct evidence linking Banks to the gun came from Green, who testified that Banks had a gun in the van and Banks tossed the gun into Green's lap. Contradictory testimony came from Ozier, who stated that he had not known there was a gun in the van, did not see Banks with a gun, and that Banks did not pass a gun to Green. Both Green and Ozier testified that they had five prior criminal convictions.

relieved of her duty to object to testimony and argument suggesting Banks' invocation of a constitutional right was inculpatory. In Wisconsin, the warrantless collection of a DNA sample is authorized only after conviction. *See* WIS. STAT. § 973.047(1f) (2007–08). All references to the Wisconsin Statutes are to the 2007–08 version unless otherwise noted.

¶ 28. Thus, the State had two eye witnesses, both with credibility issues stemming from past convictions, who presented contradictory testimony regarding Banks' possession of a gun. The State's use of Banks' refusal to submit a DNA sample bolstered the testimony of Green, who said Banks had a gun. At closing, the State emphasized Banks' refusal to support its theory that Banks feared a DNA test would unequivocally connect him to the gun. We cannot say with any confidence that the jury's verdict was untainted by the inadmissible evidence. The jury had two eyewitness versions of events and, without the DNA refusal, Ozier's observation that Banks did not have a gun may have been just as persuasive as Green's observation that Banks did have a gun. Consequently, there is a reasonable probability that, but for counsel's deficient performance, the result at trial would have been different. *See Strickland*, 466 U.S. at 694. Based upon our review of the record facts and applicable law, we conclude that Banks received ineffective assistance of counsel and is entitled to a new trial.

¶ 29. Banks presents additional grounds for his ineffective assistance of counsel claim. Although his complaint about juror bias is moot in light of our remand for a new trial, two of his remaining ineffective assistance arguments must be addressed before we remand to the circuit court.

¶ 30. Banks argues that his attorney should have asked the court to inform the jury that Wisconsin requires law enforcement to make a video or audio recording of a custodial interrogation. *See* Wis. Stat. § 972.115(2)(a).[5] Specifically, he argues that Jacobsen's testimony should have been qualified by the fact that

[5] Wisconsin Stat. § 972.115(2)(a) states in relevant part:

there was no recording of the statements Banks made to him. At trial, Jacobsen testified that he sat down with Banks and "tried to explain it the best [he could]" what Banks' detention was about. He told Banks that "there was a vehicle stopped and that there was a weapon found in or around that vehicle after a foot chase." In response, Banks told Jacobsen that he had been walking in the area after visiting someone he knew. Banks indicated to Jacobsen that he knew nothing about the incident or the gun.

¶ 31. Banks contends that when Jacobsen interrogated him about the gun, no audio or visual recording was made and that the jury was entitled to know that the interrogation should have been recorded. *See* WIS. STAT. § 972.115(2)(a). The relevant jury instruction prompts the panel to consider whether the statement was actually made by the defendant, whether the statement was accurately restated at trial, and whether the statement or any part of it ought to be believed. *See* WIS JI— CRIMINAL 180. Banks asserts that the failure to request this instruction diminished his ability to dispute the officer's recollection of what was said in the interview room. Further, it allowed the jury to hear "uncontro-

If a statement made by a defendant during a custodial interrogation is admitted into evidence in a trial for a felony before a jury and if an audio or audio and visual recording of the interrogation is not available, upon a request made by the defendant as provided in s. 972.10(5) and unless the state asserts and the court finds that . . . good cause exists for not providing an instruction, the court shall instruct the jury that it is the policy of this state to make an audio or audio and visual recording of a custodial interrogation of a person suspected of committing a felony and that the jury may consider the absence of an audio or audio and visual recording of the interrogation in evaluating the evidence relating to the interrogation and the statement in the case[.]

verted testimony that Banks may have lied to law enforcement regarding his whereabouts on the day in question."[6]

¶ 32. The State counters that the recording policy was not implicated because Banks was not under custodial interrogation when he made the statement to Jacobsen. *See* WIS. STAT. § 968.073.[7] At a pretrial motion hearing, Jacobsen testified that he and Banks were in the police department interview room. Jacobsen provided Banks with *Miranda* warnings and Banks stated he did not want to speak to Jacobsen. Banks then asked what the charges were and made a "voluntary" statement about his presence in the area of the traffic stop

---

[6] Banks was convicted on one count of obstructing an officer, contrary to WIS. STAT. § 946.41(1). At trial, he did not contest the obstructing charge, acknowledging that that he lied to the investigating officers. On appeal, he argues that the jury instruction was necessary to maintain some semblance of credibility with the jury on his defense to the possession of a firearm charge.

[7] WISCONSIN STAT. § 968.073 states in relevant part:

**Recording custodial interrogations. (1)** In this section:

(a) "Custodial interrogation" means an interrogation by a law enforcement officer ... of a person suspected of committing a crime from the time the suspect is or should be informed of his or her rights to counsel and to remain silent until the questioning ends, during which the officer or agent asks a question that is reasonably likely to elicit an incriminating response and during which a reasonable person in the suspect's position would believe that he or she is in custody or otherwise deprived of his or her freedom of action in any significant way.

. . . .

**(2)** It is the policy of this state to make an audio or audio and visual recording of a custodial interrogation of a person suspected of committing a felony unless a condition under s. 972.115(2)(a)1. to 6. applies or good cause is shown for not making an audio or audio and visual recording of the interrogation.

787

and foot chase. He told Jacobsen he had been visiting a woman who lived in that neighborhood.

¶ 33. The circuit court held that "any statements made by Mr. Banks were made without interrogation by Mr. Jacobsen." It found that "Mr. Banks then did make a statement but that the statement was not in response to interrogation by law enforcement . . . . [I]t was a voluntary or spontaneous statement by Mr. Banks." Whether a suspect was subject to interrogation by the government is a question of constitutional fact. *State v. Hambly*, 2008 WI 10, ¶ 49, 307 Wis. 2d 98, 745 N.W.2d 48. We will not upset the circuit court's findings of evidentiary or historical fact unless they are clearly erroneous. *Id.* The determination of whether the facts satisfy the legal standard is a question of constitutional law, which this court decides independently of the circuit court but benefiting from its analysis. *Id.*

¶ 34. Interrogation refers to express questioning, but also encompasses actions that are the functional equivalent. *Id.*, ¶ 46. The seminal case interpreting the meaning of interrogation is *Rhode Island v. Innis*, 446 U.S. 291 (1980). There, the United States Supreme Court explained that the term "interrogation" refers not only to express questioning, but also to the functional equivalent of express questioning. *Id.* at 301. The "functional equivalent of express questioning" means "words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response." *Hambly*, 307 Wis. 2d 98, ¶ 46. "Interrogation" must reflect a measure of compulsion beyond that which is inherent in custody itself. *Id.*

788

¶ 35. Our review convinces us that Banks' statement was not made in response to interrogation by Jacobsen. Banks concedes the interaction between himself and Jacobsen was "brief." He also concedes that Jacobsen prepared to leave once Banks invoked his right to counsel. Nonetheless, Banks asserts that he was being interrogated because of the location of the questioning (the police department interview room) and the fact that Banks was still seated at the table with Jacobsen when he made his statement. Banks offers indicia of custody, but not interrogation. When Banks asked Jacobsen about the reason for his detention, Jacobsen told him it was in regard to a green van, a foot chase, and a gun. This is not express questioning, nor is it the functional equivalent. *See id.,* ¶ 51 (officer's recitation of the charges to the suspect is not express questioning). Banks' subsequent unsolicited comment about his presence in the area was not provoked by any statement or action on the part of Jacobsen.

¶ 36. As the State emphasizes, because there was no interrogation, Banks cannot rest a claim of ineffective assistance based on counsel's failure to request a jury instruction relevant only to interrogations.

¶ 37. Banks next argues that his counsel was ineffective when she provided the State with a letter that Green had written to Banks prior to trial. The disclosure of this letter led to an adjournment of the trial and the discovery of another letter that was written by Banks to Green. The letter from Banks included statements such as: "what's understood need not to be talked about" and "you told me everything was all good, we gonna lay back" and "you need money you know I got you." Both letters were received into evidence at trial.

789

¶ 38. Banks argues that his attorney had no affirmative duty to turn over the letter. He directs us to his attorney's statements at the pretrial hearing, where she indicated that she was not sure yet whether she would use Green's letter at trial, and that it was "not that important" to the defense. However, Banks' attorney explained that while she did not see the letter from Green as "crucial" to their case, she would "consider[] using" the letter for "impeachment purposes" against Green.

¶ 39. The State also directs us to defense counsel's testimony at the posttrial *Machner*[8] hearing. There, counsel explained that Banks had given her the letter from Green and that they talked at least twice about providing the letter to the State. The strategy behind this disclosure was to show that Green was potentially uncooperative and to possibly negotiate reduced charges against Banks or, in the alternative, to use it for possible impeachment of Green's credibility at trial. According to counsel's notes, Banks had decided to disclose the letter because some of Green's statements could have been interpreted as Green taking responsibility for the crimes charged against Banks. The State also observes that Banks told his attorney about the letter that he sent to Green and assured her that it contained nothing to be worried about.

¶ 40. The circuit court determined that Banks' attorney was not deficient for disclosing the letter to the State. We agree that counsel's decision was reasonable under the circumstances. The strategic decision to use the letter for possible impeachment and to under-

---

[8] *State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

mine the State's confidence in a key witness reflects a competent assessment of the risks of disclosure. Matters of reasonably sound strategy, without the benefit of hindsight, are "virtually unchallengeable." *See Strickland*, 466 U.S. at 690–91. Furthermore, the reasonableness of counsel's actions must be taken in context where the defendant's statements or actions influenced the strategy. *See id.* at 691. Here, Banks gave the letter from Green to his attorney and they discussed the best course of action. Banks participated in the decision to disclose the letter.

## *Counting Prior Convictions for Impeachment Purposes*

¶ 41. Next, Banks argues that the circuit court erred when it decided that Green need only disclose five of his seven criminal convictions. WISCONSIN STAT. § 906.09 allows evidence of prior convictions to be introduced for the purpose of attacking witness credibility. Here, the circuit court held that Green must declare only five of his seven prior convictions because, in the remaining two cases, Green had entered guilty pleas but had not yet been sentenced. Banks alleges error based on *State v. Trudeau*, 157 Wis. 2d 51, 54, 458 N.W.2d 383 (Ct. App. 1990) (an accepted guilty plea constitutes a "conviction" for impeachment purposes under § 906.09). Both the State and the circuit court acknowledge that Banks is correct. We agree.

¶ 42. Normally, having determined that error occurred, the next step in our analysis would be to determine whether the error was harmless. However, because we remand for a new trial on other grounds, and because the circuit court has acknowledged the error, we need not address it further.

*Sufficiency of the Evidence*

¶ 43. Before we may reverse and order a new trial, we must determine whether the evidence presented was sufficient to convict Banks. If it was not sufficient, we are precluded from remanding for a new trial under the double jeopardy clauses of the United States and Wisconsin Constitutions. *See State v. Perkins*, 2001 WI 46, ¶ 47, 243 Wis. 2d 141, 626 N.W.2d 762. Evidence is insufficient to support a conviction only if, when viewed most favorably to the State, "[it] is so lacking in probative value and force that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt." *State v. Zimmerman*, 2003 WI App 196, ¶ 24, 266 Wis. 2d 1003, 669 N.W.2d 762 (quoting *State v. Poellinger*, 153 Wis. 2d 493, 507, 451 N.W.2d 752 (1990)); *see also* WIS. STAT. § 805.14. Whether the evidence is sufficient to support the conviction is a question of law that we review de novo. *See State v. Booker*, 2006 WI 79, ¶ 12, 292 Wis. 2d 43, 717 N.W.2d 676.

¶ 44. Banks asserts that the State's case relied almost entirely on the testimony of Green because he was the only witness to testify that Banks had possession of a gun. Yet, Banks argues, Green's testimony "was wildly inconsistent and was directly contradicted by a number of the State's other witnesses." He alleges that Green lied during his testimony and that nothing he said has sufficient credibility to support a conviction. Banks emphasizes the testimony of Ozier, suggesting that Ozier's contrary version of events makes Green's testimony insufficient for a conviction.

¶ 45. The State responds that the jury was free to believe whatever version of the events it chose and could accept or discount the testimony of any witness

whose credibility it questioned. Even where internal discrepancies exist in a witness's testimony or between one witness's testimony and another's, "that fact in itself does not result in concluding as a matter of law that the witness is wholly incredible." *See State v. Smith*, 2002 WI App 118, ¶ 20, 254 Wis. 2d 654, 648 N.W.2d 15.

¶ 46. In reviewing the evidence, we must keep in mind that the credibility of the witnesses and the weight of the evidence is for the fact finder, and we must adopt all reasonable inferences which support the jury's verdict. *See Poellinger*, 153 Wis. 2d at 506. The test is not whether this court is convinced of the defendant's guilt beyond a reasonable doubt, but whether a reasonable jury could have determined guilt beyond a reasonable doubt. *See State v. Jensen*, 2000 WI 84, ¶ 23, 236 Wis. 2d 521, 613 N.W.2d 170.

¶ 47. Here, the jury was presented with eyewitness testimony from Green that Banks had a gun in the van and that Banks tossed the gun to Green. That is sufficient evidence to support a conviction for possession of a firearm under Wis. Stat. § 941.29(2), which required proof that Banks "knowingly had actual physical control of a firearm." *See* Wis JI—Criminal 1343.[9] Accordingly, a new trial does not place Banks in double jeopardy. *See Perkins*, 243 Wis. 2d 141, ¶ 47 (if the evidence is sufficient to sustain a conviction, double jeopardy will not preclude a new trial).

[9] The other element the State had to prove was that Banks was a convicted felon when he possessed the gun. Neither party disputes this element of the crime.

## CONCLUSION

¶ 48. The deficient performance of counsel in failing to object to the State's questions and argument regarding Banks' refusal to submit to a DNA test was prejudicial and undermines our confidence in the outcome of the trial. All other errors alleged by Banks are rendered moot by our remand or have been addressed herein. Because the admissible evidence, viewed in the light most favorable to sustaining the conviction, is sufficient to sustain a conviction, we remand for a new trial.

*By the Court.*—Judgment and order reversed and cause remanded with directions.

¶ 49. BROWN, C.J. (*dissenting*). The majority opinion faults the prosecutor's entreaty to the jurors that asked them to penalize the defendant, Tarence A. Banks, for exercising his Fourth Amendment right to be free from a warrantless search. I agree with the majority that a defendant's invocation of his or her rights under the Fourth Amendment may not be used by the State to demonstrate consciousness of guilt. But I believe the real question in this case is whether an arrestee *has* a Fourth Amendment right to object to the collection of a DNA sample. Unless there is an established Fourth Amendment right, there is no corresponding constitutional right to refuse to submit to a DNA swab without a warrant and, therefore, it is no violation by the State to offer the refusal as consciousness of guilt.

¶ 50. I am satisfied that the law is in flux as to whether law enforcement may obtain a DNA sample of an arrestee without a warrant. Consequently, I would apply the ruling of our supreme court in *State v.*

*Maloney*, 2005 WI 74, ¶ 23, 281 Wis. 2d 595, 698 N.W.2d 583, where the court stated: "the rule that an attorney is not liable for an error of judgment on an unsettled proposition of law is universally recognized." And I would also apply *State v. McMahon*, 186 Wis. 2d 68, 84, 519 N.W.2d 621 (Ct. App. 1994), where we said that "[c]ounsel is not required to object and argue a point of law that is unsettled." My view is that Bank's counsel was not ineffective for failing to object to the consciousness of guilt argument made by the prosecutor because it is not yet known whether such an argument runs afoul of the law. I respectfully dissent.

¶ 51. To begin, I want to make clear that I agree with the majority and disagree with the State regarding one important point. The State points out that there is a substantial body of case law holding that it is improper for the government to comment on an accused's exercise of his or her Fourth Amendment right to refuse to consent to a search. The State cites a litany of cases in support. But the State then takes a ninety-degree turn and posits that because Wisconsin has not yet adopted this body of law for its own, the question is still unsettled in this state. I contend that the State's argument shows a rather myopic understanding of the *Maloney* and *McMahon* holdings. The question is not whether Wisconsin's appellate courts have adopted universal holdings documented in other foreign jurisdictions, but whether the law of those jurisdictions is "universally recognized" across this great land. And I am convinced that a prosecutor may not use a defendant's refusal to consent to a search protected by the Fourth Amendment as evidence of guilt. *See United States v. Moreno*, 233 F.3d 937, 941 (7th Cir. 2000). The reason for this universal rule is aptly explained in one terse statement by the Alaska Supreme Court in

795

*Padgett v. State*, 590 P.2d 432, 434 (Alaska 1979), that the right to refuse to consent to a warrantless search would be "effectively destroyed if, when exercised, it could be used as evidence of guilt."

¶ 52. But as I see the issue here, the question is not whether Banks had a right to refuse to consent to a search protected by the Fourth Amendment, but whether the search is protected by the Fourth Amendment at all. If there is no Fourth Amendment protection, there is no right to refuse.

¶ 53. Certainly, there are a few areas of the law where our courts have universally held that a search is not protected by the Fourth Amendment. For example, our implied consent law relating to drunk driving is one such instance. The government's right to compel a blood sample after or contemporaneous with a lawful arrest means that an arrestee has no Fourth Amendment right to refuse such a test. *See Schmerber v. California*, 384 U.S. 757, 767–72 (1966).

¶ 54. The question is whether this is another kind of search that is unprotected by the Fourth Amendment. And as to this question, my research reveals that "the jury is still out." In fact, it is my opinion that "the jury" has hardly begun to deliberate. I note that the expansion of DNA database laws to cover arrestees is an emerging issue across the United States and questions have arisen about whether arrestee status would be sufficient to allow the taking of DNA samples without a warrant. *See* John D. Biancamano, *Arresting DNA: The Evolving Nature of DNA Collection Statutes and their Fourth Amendment Justifications*, 70 Ohio St. L.J. 619, 644 (2009).

¶ 55. The commentator of the foregoing article discussed two cases, going different ways. In *In re Welfare of C.T.L., Juvenile*, 722 N.W.2d 484, 492 (Minn.

Ct. App. 2006), the Minnesota Court of Appeals struck down a statute directing law enforcement officials to take a biological specimen from a person who has been charged with an offense, but not convicted, as violating the Fourth Amendment. The Minnesota court considered the taking of a DNA swab to be an "intrusion" justifying Fourth Amendment protection. *Id.* at 489–90. But, the Virginia Supreme Court, in *Anderson v. Commonwealth*, 650 S.E.2d 702, 706 (Va. 2007), reached a different conclusion regarding Virginia's statute. The Virginia court thought a DNA swab to be "minimally intrusive" and an arrestee's privacy concern therefore pales in relation to the legitimate state interest of identifying suspects for not only the crime for which the suspect was arrested, but to solve past and future crimes. *Id.* at 705–06.

¶ 56. Of course, Wisconsin does not have a statute directed to arrestees. At least, not yet. Still, the issues permeating those two cases reveal the unsettled nature of the question. Is the taking of a swab minimally intrusive or much more intrusive? Is the taking of an arrestee's DNA justified under the "totality of the circumstances" and "special needs" approaches or not? As far as I am concerned, these are open questions—not only in Wisconsin, but elsewhere. The law is therefore not universally settled. As such, Banks' attorney cannot be deemed deficient for failing to object to the prosecutor's comments at closing arguments. Because I agree with the rest of the majority's opinion on the remaining issues, it is my contention that the judgment should be affirmed.