COURT OF APPEALS
DECISION
DATED AND FILED

November 4, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2020AP1615-CR**

STATE OF WISCONSIN

Cir. Ct. No. **2014CF36**

IN COURT OF APPEALS
DISTRICT IV

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

MARIO T. OSTRUM,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Wood County: TODD P. WOLF, Judge. *Affirmed.*

Before Blanchard, P.J., Fitzpatrick, and Graham, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Mario T. Ostrum appeals a judgment of conviction for one count of first-degree sexual assault of a child. He contends that the evidence at trial was insufficient for the jury to conclude beyond a reasonable doubt that he had sexual contact with the victim or, in the alternative, that he is entitled to an evidentiary hearing and a new trial based on newly discovered evidence. He also contends that his sentence should be modified, either because he has presented a new factor warranting modification or because it is unduly harsh. We reject Ostrum's arguments and affirm.

## BACKGROUND

¶2 On December 23, 2013, nine-year-old E.B. and ten-year-old F.S. were sleeping at the home that Ostrum shared with his wife, Jenny Ostrum.[1] At some point during the evening, E.B. woke F.S. and said that Ostrum had sexually assaulted her. E.B. and F.S. woke Jenny and told her the same thing.

¶3 The incident was reported to the police the following day. At that time, F.S. also told police that Ostrum had assaulted her on several separate occasions. The State charged Ostrum with two counts of first-degree sexual assault of a child contrary to WIS. STAT. § 948.02(1)(e), the first count pertaining to F.S. and the second count pertaining to E.B.

---

[1] We refer to the child witnesses by their initials consistent with WIS. STAT. §§ 809.19(1)(g) and 809.86 (2019-20), and we refer to Jenny Ostrum by her first name to distinguish her from the defendant. All references to the Wisconsin Statutes are to the 2019-20 version.

¶4    Ostrum pled not guilty to the charges and then fled to California. He was eventually extradited to Wisconsin, and his trial took place in November 2017.

¶5    The State presented several witnesses at trial, including the officer who investigated the allegations and the officer who conducted recorded interviews of the girls in early January 2014, shortly after the assaults allegedly occurred. We recount pertinent details of these witnesses' testimony as needed below.

¶6    The State also played the audiovisual recordings of the statements that E.B. and F.S. had given in 2014, and both were physically present at trial for cross and redirect examinations.[2] We recount E.B.'s recorded statement and trial testimony in general terms here and then in greater detail as needed below.

¶7    In her video testimony, the nine-year-old E.B. stated that, on the evening she stayed at Ostrum's house, he touched her "front private," which she identified as the place where "you go pee pee." On cross-examination in live courtroom testimony, E.B., who was by then thirteen years old, testified that she was "kind of awake and asleep at the same time" when Ostrum touched her. However, she identified with certainty that it was Ostrum who touched her that evening.

---

[2] *See* WIS. STAT. § 908.08 (establishing process by which, after notice and a hearing in which the circuit court makes certain findings about the characteristics of a child witness and the contents of an audiovisual recording, the testimony of a child who is available to testify may be presented by audiovisual recording, provided that the child will be immediately available for crossexamination).

¶8      The jury found Ostrum guilty of the charge relating to E.B., and the circuit court entered a judgment of conviction on that count.  The jury was unable to reach a unanimous verdict as to the charge relating to F.S., and the court declared a mistrial on that count.

¶9      The circuit court sentenced Ostrum to fifteen years of incarceration, consisting of nine years of initial confinement and six years of extended supervision.  We provide additional facts about the information presented at sentencing and the basis for the court's sentencing decision as needed below.

¶10     Ostrum filed a motion for postconviction relief under WIS. STAT. §§ 974.02 and 809.02(2)(h), and we discuss its allegations in detail below.  In short, Ostrum argued that he was entitled to a new trial based on newly discovered evidence, consisting primarily of statements that E.B. purportedly made to Ostrum's nephew shortly after the trial.  Ostrum also argued, in the alternative, that he was entitled to sentence modification based on a recent diagnosis of autism spectrum disorder, among other mental health disorders.  Citing *State v. McAlister*, 2018 WI 34, 380 Wis. 2d 684, 911 N.W.2d 77, the circuit court denied the motion for a new trial based on newly discovered evidence.  It also determined that the information about Ostrum's mental health was not a new factor justifying sentence modification.

## DISCUSSION

¶11     Ostrum raises three issues on appeal.  First, he challenges the sufficiency of the evidence to support the charge that he had "sexual contact" with E.B.  Second, Ostrum contends that he is entitled to an evidentiary hearing and a new trial based on newly discovered evidence.  Third, he argues that he is entitled

4

to sentence modification. We address each argument in turn, rejecting Ostrum's arguments for the reasons explained below.

## I. Sufficiency of the Evidence

¶12    We first consider whether the evidence presented at trial was sufficient to sustain Ostrum's conviction for first-degree sexual assault. Before the jury could find him guilty, the State was required to prove beyond a reasonable doubt that Ostrum had "sexual contact" with E.B. WIS. STAT. § 948.02(1)(e); WIS JI—CRIMINAL 2102E. The instruction presented to the jury defined "sexual contact" as:

> [A]n intentional touching of the vagina or pubic mound of E.B. ... by the defendant. The touching may be of the vagina or pubic mound directly or it may be through the clothing. The touching may be done by any body part or by any object, but it must be an intentional touching.
>
> Sexual contact also requires that the defendant acted with intent to become sexually aroused or gratified or sexually degrade or humiliate E.B.

WIS JI—CRIMINAL 2101A (citing WIS. STAT. § 948.01(5)).

¶13    Ostrum makes a limited argument about the sufficiency of the evidence. He implicitly acknowledges that the evidence was sufficient to prove the following: that it was Ostrum rather than someone else who touched E.B., that he did so intentionally, and that he acted with the intent to become sexually aroused or gratified or to sexually degrade or humiliate E.B. However, Ostrum argues that the evidence was insufficient to prove that he actually touched E.B.'s vagina or pubic mound.

¶14    Ostrum's argument proceeds as follows. E.B. did not use the words "vagina" or "pubic mound" in her recorded interview or in her trial testimony, and

the evidence that the State elicited from her was not "specific enough to meet that element of the offense." Ostrum contends that it "would perhaps have been understandable for the State's failure to obtain specific testimony on this point if E.B. was only nine years old at the time of trial," but she was thirteen by the time the trial took place and "old enough to be able to identify" her body parts using precise language. As such, Ostrum asks us to reverse his conviction on the basis that the evidence was insufficient to prove that he touched E.B.'s vagina or pubic mound.

¶15 We apply a highly deferential standard when reviewing the sufficiency of the evidence to support a conviction. *See State v. Poellinger*, 153 Wis. 2d 493, 503-504, 451 N.W.2d 752 (1990). We "examine the record to find facts that support upholding the jury's decision to convict," *State v. Hayes*, 2004 WI 80, ¶57, 273 Wis. 2d 1, 681 N.W.2d 203, and we adopt all reasonable inferences to support the conviction, *State v. Banks*, 2010 WI App 107, ¶46, 328 Wis. 2d 766, 790 N.W.2d 526. A jury "may not indulge in inferences wholly unsupported by any evidence," *State ex rel. Kanieski v. Gagnon*, 54 Wis. 2d 108, 117, 194 N.W.2d 808 (1972), but the "'credibility of the witnesses and the weight of the evidence'" are determinations that rest with the factfinder, *Poellinger*, 153 Wis. 2d at 504 (quoted source omitted). We will not substitute our judgment for that of the jury unless the evidence, "viewed most favorably to the state and the conviction, is so lacking in probative value and force that ... no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt." *Id.* at 507.

¶16 Here, we conclude that the State presented sufficient evidence of sexual contact. Although E.B. never explicitly used the words "vagina" or "pubic mound," the jury could draw reasonable inferences that Ostrum had touched her vagina or pubic mound from the following evidence.

¶17    Deputy Doug Christianson was the State's first witness. Christianson responded to the Ostrum household the morning after the alleged assault, and he testified about what E.B. told him had occurred.

¶18    According to Christianson, E.B. told him that she was attempting to sleep on a couch in the living room when she felt someone's hand going up her pant leg. When she looked down, she saw that it was Ostrum. Christianson testified that E.B. described the incident as follows:

> [Ostrum] continued putting his hand up her pant leg until it reached the area of her groin; and when I asked her where, she patted her groin area. I asked at that point if this was over the top of her underwear or if this would have been under her underwear. She stated that it was over the top. And I said, this was on your privates; and she nodded yes. Then I asked her just to verify what you mean here by privates, do you mean your vagina? She stated yes.

¶19    Deputy Sara McCormick was the officer who conducted the recorded forensic interview of E.B. McCormick also testified, and her recorded interview of E.B. was played for the jury. On the video, McCormick asked E.B. why the interview was happening, and E.B. said it was because "Jenny's husband Mario [Ostrum] touched me where he's not supposed to." E.B. then indicated that Ostrum touched her on her "front private." She pointed to the front pubic area on a female body diagram and identified it as the area where "you go pee pee." When McCormick asked E.B. to tell her "all about it," E.B. declined on the grounds that her mother told her not to talk about it. E.B.'s mother was allowed in the interview room and assured her it was okay to tell McCormick what happened. E.B. stated that Ostrum approached her after F.S. fell asleep on a couch. Ostrum sat down near E.B.'s feet pretending to sleep. At that point, she felt Ostrum's hand, starting at her ankles, going up her pant leg. According to E.B., Ostrum attempted to pull off her pants, he "finally got his hand up there," and then he

7

"touched it." E.B. told Ostrum to "stop it" and "go to bed." The last time E.B. told him to stop, Ostrum said "alright, alright, alright, I'll stop," and returned to the kitchen table and pretended to sleep. E.B. described the sweatpants she was wearing, and by using a doll, showed McCormick how Ostrum placed his hand on her pubic mound.

¶20 During cross-examination, E.B. was asked whether Ostrum put his hand "all the way up [your pant leg] past your knee and all the way up to what's been referred to as your private area." She responded, "Yes." When asked whether she felt Ostrum's hand, E.B. replied that she felt it around her "upper thigh." Later, on redirect, the State asked E.B. where Ostrum's hand was when he finally stopped. E.B. replied that his hand was "between [her] legs." During her redirect examination, the State asked E.B. whether she was telling the truth when she identified Ostrum as the person who "touched [her] private parts," and she responded, "Yes."

¶21 Following E.B.'s cross-examination, McCormick identified the diagram that E.B. used to show where Ostrum had touched her, and it was admitted into evidence.

¶22 As stated above, a jury may base its verdict on inferences reasonably derived from the evidence, and we will not disturb a jury's guilty verdict unless no reasonable jury could have found the defendant guilty. *See **Poellinger***, 153 Wis. 2d at 507. That is not the case here. Based on the recorded statement of E.B., or the testimony provided by Christianson, or McCormick, or E.B., the jury could reasonably infer that Ostrum had sexual contact with E.B. as that term was defined in the jury instructions. Although E.B. did not use a specific noun to identify precisely where Ostrum had touched her, she told Christianson that Ostrum had

touched her vagina, she used a doll and a diagram to communicate to McCormick that Ostrum touched her "front private" where "you go pee pee," and she testified that Ostrum's hand was "all the way up ... to [her] private area." Accordingly, we conclude that the evidence was sufficient to support the conviction for first-degree sexual assault of a child.[3]

## II. Newly Discovered Evidence

¶23 We now turn to Ostrum's argument that he is entitled to an evidentiary hearing and ultimately a new trial based on newly discovered evidence. A circuit court must hold an evidentiary hearing on a motion for a new trial based on newly discovered evidence if the motion alleges facts which, if true, would entitle the defendant to relief. *See State v. Allen*, 2004 WI 106, ¶¶9, 12-13, 274 Wis. 2d 568, 682 N.W.2d 433.

¶24 To set aside a judgment of conviction based on newly discovered evidence, the new evidence must be "sufficient to establish that a defendant's conviction was a 'manifest injustice.'" *State v. Plude*, 2008 WI 58, ¶32, 310 Wis. 2d 28, 750 N.W.2d 42 (quoted source omitted). A defendant must first satisfy four requirements by clear and convincing evidence: (1) the evidence was discovered

---

[3] We reject the argument Ostrum makes based on the State's motion during trial to amend the count related to E.B. to an attempted sexual assault rather than a completed act. The State made this motion after the close of all evidence, stating that E.B.'s testimony could "at least create the impression that the act was not completed." Ostrum objected, and the circuit court denied the State's motion. The State's motion may have reflected the prosecutor's concern that a jury might not find Ostrum guilty of first-degree sexual assault based on E.B.'s testimony, but it is not an admission that the evidence was insufficient to support a guilty verdict on that count. As defense counsel explained when successfully arguing that the motion should be denied, E.B.'s recorded statement and cross-examination, if believed, was that Ostrum "touched [E.B.] over her underwear but inside her pants in the pubic area," and that testimony, if believed, "would meet the definition of a sexual assault."

after conviction; (2) the defendant was not negligent in seeking the evidence; (3) the evidence is material to an issue in the case; and (4) the evidence is not merely cumulative. WIS. STAT. § 805.15(3)(a)-(d); *see also Plude*, 310 Wis. 2d 28, ¶32. If the court determines that these four requirements have been met, it then considers whether there is "a reasonable probability of a different outcome"—that is, whether a jury would find that the newly discovered evidence "had a sufficient impact on other evidence presented at trial that a jury would have a reasonable doubt as to the defendant's guilt." *Plude*, 310 Wis. 2d 28, ¶¶32-33.

¶25 Defendants must satisfy additional requirements if the newly discovered evidence is a recantation. *McAlister*, 380 Wis. 2d 684, ¶33. In such cases, the recantation must be corroborated by "additional newly discovered evidence" showing that "'there is a feasible motive for the initial false statement'" and that "'there are circumstantial guarantees of the trustworthiness of the recantation.'" *Id.* (quoting *State v. McCallum*, 208 Wis. 2d 463, 478, 561 N.W.2d 707 (1997)).

¶26 In this case, Ostrum requested an evidentiary hearing to present newly discovered evidence. The new information consists primarily of a purported conversation between E.B. and R.W. (who is Ostrum's nephew) that is said to have occurred in 2017, shortly after the trial ended. Ostrum supported his motion with his postconviction counsel's affidavit, which summarizes the

interviews that counsel conducted with R.W. and his mother (who is Ostrum's sister) in 2019.[4]

¶27    The attorney averred to the following. E.B. approached R.W. in the school library a day or two after the trial. E.B. told R.W. that she was sorry about accusing Ostrum, and that her mother made her pursue the charges. E.B. said that "someone" touched her on the night in question, but the room was dark, she did not know who it was, and it could have been someone other than Ostrum. E.B. said that the hand that touched her did not feel like a man's hand. E.B. said that the day after the assault, she overheard Jenny Ostrum tell E.B.'s mother to press charges; otherwise, Jenny would tell E.B. that she was adopted. R.W. told his mother about this conversation.

¶28    In his postconviction motion, Ostrum argued that this information in the affidavit satisfied the four requirements for newly discovered evidence and that there was a reasonable probability of a different result if R.W.'s testimony had been presented at trial. Ostrum also argued that the new information should not be considered a "recantation" because E.B.'s statements to R.W. do not meet the

---

[4] We observe that, although we assume without deciding at this stage that the allegations set forth in Ostrum's postconviction pleadings are true, it is not clear what R.W. or his mother would actually testify to at an evidentiary hearing. Neither submitted an affidavit, and our only understanding of their expected testimony is based on representations Ostrum's postconviction counsel makes about the interviews he conducted with R.W. and his mother. These interviews occurred fifteen months after the conversation between E.B. and R.W. purportedly occurred, and sixteen months before counsel memorialized his understanding of R.W.'s and his mother's expected testimony in his affidavit dated June 2020.

For the sake of completeness, we also note some discrepancies in the affidavit. The affidavit indicates that E.B. and R.W. attended school together during the 2013-2014 school year, but their purported conversation did not occur until after the trial, which took place in 2017. Additionally, although the affidavit was signed by postconviction counsel on June 30, 2020, the notary stamp is dated August 1, 2013. These discrepancies are not material to our analysis.

"classic definition" of that term, or, in the alternative, if the court treated E.B.'s "subsequent inconsistent statements as a recantation of her trial testimony" it "should still find that Ostrum has met his burden."

¶29    The circuit court denied Ostrum's postconviction motion for a new trial without holding an evidentiary hearing.  It found that the new information satisfied the first three requirements for newly discovered evidence—it was new, it had not been negligently overlooked, and at least some of the testimony was material to an issue in the case.  However, citing *McAlister*, the court also determined that R.W.'s testimony would be cumulative because it was a challenge to E.B.'s credibility, which was a topic addressed at trial.  The court also determined that this was a "recanting-type situation," that Ostrum did not establish a "feasible motive[]" for E.B. to falsify her initial incriminating statements, and that there were not "circumstantial guarantees of trustworthiness" of the new information in postconviction counsel's affidavit.

¶30    The ultimate decision to grant a motion for a new trial based on newly discovered evidence rests in the circuit court's discretion.  *Plude*, 310 Wis. 2d 28, ¶31.  We will affirm a court's exercise of discretion if the decision has a reasonable basis, and the circuit court reached its conclusion in accordance with accepted legal standards and the facts of record.  *See* **State v. LaCount**, 2008 WI 59, ¶15, 310 Wis. 2d 85, 750 N.W.2d 780.  In this case, we do not conclude that the court erroneously exercised its discretion in light of our supreme court's recent pronouncements in *McAlister*.

### A.  Overview of *McAlister*

¶31    In *McAlister*, two individuals, Jefferson and Waters, were suspected of committing a string of armed robberies and apprehended by the police.

*McAlister*, 380 Wis. 2d 684, ¶¶5-7. Both implicated McAlister as the mastermind of the robberies and the getaway driver. *Id.*, ¶¶6-7. In exchange for their cooperation and provision of "truthful testimony" at McAlister's trial, Jefferson and Waters both expected to receive favorable treatment from the prosecution in their own criminal cases. *Id.*, ¶¶43, 48. Both testified and implicated McAlister during his trial, and both were aggressively cross-examined by McAlister's attorney about their lengthy criminal records, their prior histories of making false statements to the police, and the "consideration" they expected to receive as a result of their testimony against McAlister. *Id.*, ¶¶10-11, 16. The jury found McAlister guilty. *Id.*, ¶18.

¶32 Some years later, McAlister filed a motion seeking a new trial based on newly discovered evidence consisting of affidavits from three inmates. One of the inmates averred that he had been in prison with Waters prior to McAlister's trial, and that Waters told him that Waters coordinated with Jefferson about what to say to police and lied about McAlister's involvement in the crime. *Id.*, ¶21. The other two inmates averred that they had been in jail with Jefferson prior to McAlister's trial, and that Jefferson told them that Jefferson falsely accused McAlister to police to get a shorter sentence. *Id.*, ¶¶22, 23. The circuit court denied the motion for a new trial without holding a hearing. *Id.*, ¶24

¶33 On review, our supreme court determined that the circuit court did not erroneously exercise its discretion when it denied the motion. *Id.*, ¶¶4, 64. In the course of its opinion, the *McAlister* court set forth two propositions that are significant to our analysis here. The first relates to the cumulative nature of the newly discovered evidence, and the second to the corroboration requirements for recantations. Based on these two propositions, we cannot say that the circuit court erroneously exercised its discretion in Ostrum's case when it determined, without

13

holding an evidentiary hearing, that R.W.'s expected testimony would not require a new trial. More specifically, as we now explain, the court was within its discretion to conclude that the proffered testimony was cumulative, and also that Ostrum was required to provide corroboration, which he did not do.

## B. Cumulative

¶34 The first proposition from *McAlister* that is significant to this appeal is its conclusion that the circuit court did not err when it determined that the new affidavits were cumulative. The *McAlister* court stated that the new evidence was "of the same general character, and to the same point for which testimony was elicited at trial"—that is, whether Jefferson and Waters lied when they implicated McAlister in order to get favorable plea bargains for themselves. *Id.*, ¶¶46, 49, 50, 64. The court also stated: "Where the credibility of a prosecution witness was tested at trial, evidence that again attacks the credibility of that witness is cumulative." *Id.*, ¶39.

¶35 Based on our supreme court's guidance in *McAlister*, the circuit court could reasonably determine that the proffered evidence of E.B.'s statements to R.W. was cumulative. As in *McAlister*, the "gravamen" of Ostrum's argument is that E.B. "perjured [her]self at his trial" when she identified Ostrum with certainty as the person who assaulted her. *See id.*, ¶27. E.B.'s purported statements to R.W. appear to cast doubt on the statements she made to police and her subsequent testimony, and they also imply that she was under some sort of pressure to continue to make false allegations against Ostrum. Although there was no suggestion at trial that E.B. was uncertain about her assailant's identity, her

14

memory, motive, and credibility were challenged at trial.[5]  Following ***McAlister***, the circuit court could reasonably have determined that the new evidence of E.B.'s statements to R.W. was cumulative.  *See **id.***, ¶39.

¶36    Ostrum argues that "the whole point" of his motion is that E.B.'s post-trial statements to R.W. were "different" from and "inconsistent" with her trial testimony, and that inconsistent post-trial statements "cannot be cast as cumulative" to E.B.'s trial testimony.  We understand Ostrum to be arguing that E.B.'s alleged statements to R.W. should be considered as "substantive, exculpatory evidence" that goes beyond E.B.'s credibility, and that Ostrum was unable to present these statements and to cross-examine E.B. about them at trial.  Yet, the same was true of the newly discovered statements by Jefferson and Waters that were determined to be cumulative in ***McAlister***.  Ostrum's attempt to distinguish ***McAlister*** on this basis fails to persuade us that the circuit court erroneously exercised its discretion.

¶37    In reaching this conclusion, we do not mean to suggest that the circuit court was required to find that the proffered evidence was "of the same general character, and to the same point for which testimony was elicited at trial." *See **id.***, ¶¶46, 49, 50, 64.  Nevertheless, based upon the applicable standard of

---

[5] For example, during the trial, Ostrum cross-examined Christianson, attempting to create the suggestion that E.B., having falsely incriminated Ostrum to Christianson, would fear that she would get in trouble if she later admitted that she had lied.  Ostrum raised the fact that F.S. and E.B. had spent the evening of December 23, 2013, discussing their alleged assaults with one another, insinuating that E.B. took that opportunity to fabricate and rehearse her account before making the incriminating statements to Jenny Ostrum and the police.  Ostrum also elicited admissions from E.B. that she did not remember certain aspects of the evening.  In addition, the State inquired into E.B.'s motives and overall credibility by asking her whether she knew Ostrum well and whether she would have any reason to be angry with him or make a false accusation to get him into trouble.

review and *McAlister*'s broad statements about the cumulative nature of evidence attacking a prosecution witness, *id.*, ¶39, we cannot say that the circuit court erred. Whether testimony is cumulative is a fact-intensive and discretionary determination, and *McAlister* provides a reasonable basis for the circuit court to reach the conclusion it reached in accordance with accepted legal standards and the facts of record. *See* *LaCount*, 310 Wis. 2d 85, ¶15. As the *McAlister* court explained, "whether to grant a hearing … based on newly discovered evidence that claims to uncover perjured trial testimony requires careful examination of the movant's specific factual allegations in the context of the record as a whole." *McAlister*, 380 Wis. 2d 684, ¶28.

¶38    Under *McAlister*, our conclusion that the circuit court did not erroneously exercise its discretion in determining that the new evidence was cumulative is dispositive of the outcome of this issue on appeal. As a result, we need not consider any other aspect of the test for newly discovered evidence. However, for the sake of completeness, we further explain why Ostrum does not persuade us that the circuit court erred when it treated E.B.'s statements to R.W. as a recantation requiring corroboration.

### C.  Corroboration

¶39    The second important proposition from *McAlister* that is significant to this appeal is our supreme court's determination that the circuit court did not err when it treated the new statements as recantations requiring corroboration. *McAlister*, 380 Wis. 2d 684, ¶63. The *McAlister* court acknowledged that Jefferson's and Waters' purported pre-trial statements that they planned to perjure themselves at trial were not "classic recantations" and did not "fully meet" the definition of that term. *Id.*, ¶33 n.4, ¶¶53-56. That is, the new evidence at issue in

*McAlister* involved statements from new affiants relaying what Jefferson and Waters purportedly told them about plans to lie in trial testimony, as opposed to publicly sworn post-verdict admissions of perjury by Jefferson and Waters themselves. *Id.*, ¶54. Nevertheless, the court determined that the affidavits "bear a similarity to recantation evidence in that they use what is claimed to be Jefferson's and Waters' own words to allege they lied at trial," and therefore corroboration should be required. *Id.*, ¶¶55-56. Applying the corroboration requirements—newly discovered evidence of a feasible motive for the initial false statement and circumstantial guarantees of trustworthiness of the recantation—the court determined that the new affidavits failed to satisfy these requirements, in part because the affidavits were created years after the events they purported to describe. *Id.*, ¶¶52, 57-62.

¶40 Ostrum argues that E.B.'s purported statements to R.W. should not be treated as a recantation, and the corroboration requirements should not apply for two distinct reasons. First, he points out that E.B. did not formally or publicly withdraw or renounce her testimony from trial. Yet, the same was true of Jefferson and Waters and the new evidence in *McAlister*. Second, Ostrum also contends that, unlike in *McAlister*, in which the statements treated as recantation occurred prior to trial and in a penal setting, E.B. spoke to R.W. after the trial had concluded, and the conversation took place at school, a "place free of outside pressure." However, *McAlister* does not contain any language suggesting that, if similar statements were made after trial, they could not be treated as recantations. Nor does *McAlister* suggest a different result for statements made in settings other

17

than a penal institution.[6] We conclude that the circuit court did not erroneously exercise its discretion when it determined that corroboration was required.

¶41 Having rejected Ostrum's arguments about the applicability of the corroboration requirements, we now turn to the circuit court's determination that these requirements were not met.

¶42 First, the circuit court could have reasonably determined that Ostrum failed to present new evidence of a feasible motive for E.B. to have made false statements during the investigation and trial. According to the affidavit, E.B. told R.W. that she overheard "Jenny Ostrum tell [E.B.'s mother] to press charges, and some kind of discussion about telling E.B. that she was adopted otherwise." Yet the record shows that Jenny supported Ostrum, not E.B., at trial. Under the circumstances, the circuit court could have reasonably questioned the plausibility of the claim that Jenny urged E.B.'s mother to pressure E.B. to pursue charges against Ostrum.

¶43 Second, the circuit court could have reasonably determined that the new evidence of E.B.'s purported statements to R.W. lacked circumstantial guarantees of trustworthiness. Ostrum argues that E.B.'s purported statements are trustworthy because they were made at school and on "E.B.'s own accord." However, as the circuit court put it, "[t]here's nothing directly stating that E.B. is agreeing that this is what occurred here ...." Ostrum did not offer a sworn affidavit from a recanting witness, or even from someone who spoke to a recanting witness.

---

[6] The discussion about the incarceration of the witnesses in *McAlister* was used to explain that the new testimony lacked circumstantial guarantees of trustworthiness, not to support Ostrum's suggestion that the corroboration requirements only apply to statements made in a penal institution. *State v. McAlister*, 2018 WI 34, ¶61, 380 Wis. 2d 684, 911 N.W.2d 77.

Instead, Ostrum offered a sworn affidavit from his postconviction counsel, who spoke to Ostrum's fourteen-year-old nephew, and the attorney summarized the substance of a conversation that the nephew purportedly had with E.B. fifteen months earlier. The court determined that there were no circumstantial guarantees of trustworthiness because the report came from Ostrum's sister and nephew, and because of the "length of delay" in reporting the conversation. Based on *McAlister*, the court did not erroneously exercise its discretion. *McAlister*, 380 Wis. 2d 684, ¶60 (concluding that "the length of time that passed between McAlister's trial and the submission of the affidavits cuts against concluding that the affidavits are trustworthy").

¶44 In sum, in light of our supreme court's recent pronouncements in *McAlister*, we cannot say that the circuit court erroneously exercised its discretion. To the extent that Ostrum asks us to disregard *McAlister* as wrongly decided, that is an argument for another court. *See Cook v. Cook*, 208 Wis. 2d 166, 189-90, 560 N.W.2d 246 (1997) (we cannot overrule precedent from our supreme court).[7]

---

[7] Ostrum also sought to present new evidence of unsubstantiated sexual assault allegations that F.S. made against her father in 2018. We conclude that the circuit court did not err when it determined that the unsubstantiated allegations were not newly discovered evidence warranting a new trial.

By way of background, F.S.'s father told Ostrum's investigator that F.S. falsely accused him of sexual assault, and that investigators ultimately determined that the allegations were unsubstantiated. The circuit court determined that the evidence was cumulative because F.S.'s credibility was addressed at trial, resulting in a hung jury on the count pertaining to F.S., and that the evidence was not material to the count pertaining to E.B. because there is no relationship between any purportedly false allegations that F.S. made regarding her father's conduct and E.B.'s allegations regarding Ostrum's conduct. Ostrum does not provide any adequate explanation on appeal of how any purportedly false allegations F.S. made regarding her father in 2018 are material to the count pertaining to E.B. As the State explains, Ostrum would likely face barriers to admissibility under WIS. STAT. § 972.11(2)(b)3., and Ostrum effectively concedes this point by failing to address it in his reply brief. *See United Coop. v. Frontier FS Coop.*, 2007 WI

(continued)

19

### III. Ostrum's Sentence

¶45     We now turn to Ostrum's arguments that his sentence should be modified.  We begin our discussion by providing additional background regarding the information presented to the circuit court during sentencing and the court's exercise of its sentencing discretion.

¶46     First-degree sexual assault committed against a child under the age of thirteen is a class B felony and, upon conviction, Ostrum faced a maximum sentence of sixty years.  *See* WIS. STAT. §§ 948.02(1)(e), 939.50(3)(b).   The prosecutor asked the circuit court to impose twenty years of initial confinement and twenty years of extended supervision.  Defense counsel asked the court to impose three years of initial confinement and four years of extended supervision.  The author of the presentence investigation report recommended a sentence of seven to nine years of initial confinement followed by three to four years of extended supervision.   After considering these recommendations and the information discussed below, the court imposed a fifteen-year sentence comprised of nine years initial confinement and six years of extended supervision.

¶47     Prior to the sentencing hearing, the circuit court was presented with a presentence investigation report and letters of support written by members of Ostrum's family.  The report included comments from Ostrum and his mother indicating a likelihood that Ostrum was autistic, although he had not been diagnosed with that disorder.  Ostrum's mother described his abscondence to California as a "'fight or flight' situation that is very common with people with

---

App 197, ¶39, 304 Wis. 2d 750, 738 N.W.2d 578 (appellant's failure to respond in reply brief to an argument made in response brief may be taken as a concession).

autism," and she also reported that Ostrum had experienced extreme social anxiety since he was a child. The report also included information about Ostrum's history of alcohol and substance use, which, according to Ostrum, stemmed from his depression. Although the letters of support from Ostrum's family members were not made part of the appellate record, the prosecutor, defense counsel, and the court all commented on them during the hearing. Apparently, Ostrum's family members expressed concern that Ostrum's "condition" would be exacerbated by confinement in prison.

¶48 During the sentencing hearing, E.B.'s mother read a prepared statement describing how the assault, Ostrum's abscondence, and his release on bond pending trial had affected E.B. She indicated that E.B. had nightmares about Ostrum after the assault, that she started sleeping with her lights on, and that her demeanor at school and at home had changed for the worse. E.B. had been making progress in counseling, but the ordeal of preparing for trial caused E.B. to "withdraw" all over again. E.B.'s mother asked the court to impose "a minimum of 15 years actual prison time" so that E.B. and F.S. would be about to "finish high school, college, and start their adult lives [without] having to look over their shoulders to see where [Ostrum's] at."[8]

¶49 The prosecutor argued that a long period of confinement was needed to protect the public, especially in light of what the prosecutor characterized as Ostrum's failure to take responsibility for his crime. Defense counsel emphasized

---

[8] In its comments, the circuit court noted that, although the prosecutor and E.B.'s mother had made sentencing arguments about alleged assaults of F.S., it would not consider F.S.'s unproven allegations when imposing sentence. Ostrum does not argue that any comments about F.S. improperly influenced the court's sentencing determination.

21

the wide range of conduct criminalized as first-degree sexual assault of a child and indicated that the specific conduct for which Ostrum had been convicted, while serious, was at the lower end of that range and did not warrant the lengthy sentence recommended by the State. Defense counsel also pointed to Ostrum's history of depression and that doctors had told him that he had "every symptom or indicator" of a lower level of autism. Specifically, counsel noted that there was "much discussed … in the letters regarding issues he's had, everything from depression and things of that nature to … him being on … what they describe as the autism spectrum." Although defense counsel had not used Ostrum's mental health as a defense at trial, he argued that it contributed toward Ostrum being a "misunderstood man" who had "a lot of good in him" and "a lot to offer."

¶50     As stated above, the circuit court sentenced Ostrum to nine years of initial confinement and six years of extended supervision. The court identified the various factors and objectives it considered in selecting this sentence. The court recognized that, while undiagnosed, Ostrum's autism may have contributed to his decision to abscond to California. As for the gravity of the offense, the court acknowledged that, without minimizing the effect that Ostrum's conduct had on E.B., "unfortunately we see worse type[s] of [child sexual] assaults." It further indicated that it had crafted Ostrum's sentence in part so that he would remain confined until E.B. was in her twenties, explaining, "I don't know if she plans to go to college," but even if not, she will "be able to start at least employment and a life without having to worry about this as far as her protection." Finally, the court noted that the sentence imposed was "not all that dissimilar" from the recommendation in the presentence investigation report.

22

¶51     Ostrum argues that his sentence should be modified, either because he has presented a new factor not known to the circuit court during sentencing, or because it is unduly harsh. We address these arguments in turn.

### A. New Factor

¶52     Within certain constraints, circuit courts have discretion to modify a sentence based on a "new factor" presented to the court after sentencing. *State v. Harbor*, 2011 WI 28, ¶35, 333 Wis. 2d 53, 797 N.W.2d 828. A "new factor" is "a fact or set of facts" that is "highly relevant to the imposition of sentence, but not known to the trial judge at the time of original sentencing, either because it was not then in existence or because, even though it was then in existence, it was unknowingly overlooked by all of the parties." *Rosado v. State*, 70 Wis. 2d 280, 288, 234 N.W.2d 69 (1975); *see also Harbor,* 333 Wis. 2d 53, ¶¶40, 52.

¶53     A circuit court follows a two-step analysis when determining whether a defendant is entitled to sentence modification based on a new factor. First, the court considers "[w]hether a fact or set of facts presented by the defendant constitutes a 'new factor.'" *Harbor*, 333 Wis. 2d 53, ¶33. The defendant has the burden to demonstrate the existence of a new factor by clear and convincing evidence. *Id.*, ¶36. Second, the court considers whether, in its discretion, "that new factor justifies sentence modification." *Id.*, ¶33. The first step presents a question of law that we review de novo, and we review the circuit court's determination of the second step for erroneous exercise of discretion. *Id.,* ¶33.

¶54     Ostrum's claim is founded on an evaluation report that he presented to the circuit court along with his postconviction motion. That report, which was authored and submitted by a psychiatrist in 2020, two years after Ostrum was

sentenced, diagnoses Ostrum with autism spectrum disorder, major depressive disorder (recurrent, moderate severity), and unspecified anxiety disorder, along with alcohol and cannabis use disorder (both in remission). The psychiatrist opined that, as a result of Ostrum's autism spectrum disorder, he has "significant core deficits, primarily within the social realm," and that he suffers from "hypersensitivity to various sensory stimuli, including bright lights, environmental noise, and physical touch." The report also noted that autism sprectrum disorder "is a spectrum disorder," and that more severe autism spectrum disorder "is typically accompanied by language and/or intellectual impairments. In Mr. Ostrum's case, there is no evidence of gross language impairment or intellectual disability." According to the psychiatrist, Ostrum's mental health conditions have resulted in "an exceptionally aversive experience during his period of incarceration," and it has "contributed to significant psychiatric sequelae, including depression, anxiety, and suicidality." The circuit court denied the motion for sentence modification, reasoning that additional information provided by the psychiatrist was not a new factor as that term is defined under Wisconsin law.

¶55   Ostrum takes issue with the circuit court's determination that his mental health is not a new factor. According to Ostrum, although "there were hints" about his mental health during sentencing, the court lacked "a meaningful assessment of the nature and extent" of Ostrum's mental health disorders, which

24

was "critical information needed to impose an appropriate sentence" consistent with Ostrum's rehabilitative needs.[9]

¶56　We disagree.  There is no doubt that a defendant's mental health can be an important sentencing consideration, *see State v. Gallion*, 2004 WI 42, ¶43 n.11, 270 Wis. 2d 535, 678 N.W.2d 197, and the record provides no reason for us to think that the court doubted the serious nature of Ostrum's reported mental health concerns.  However, as shown above, the court was presented with information about Ostrum's reported autism spectrum disorder, depression, anxiety, and substance use disorder, and it considered these underlying conditions when it imposed Ostrum's sentence.  The court could have been presented with even more information about Ostrum's mental health at the time of sentencing; however, with any sentencing consideration, that will often be the case.  *See, e.g.*, *Harbor*, 333 Wis. 2d 53, ¶27.  Based on the information that was presented to the court, we cannot say that Ostrum's underlying mental health condition was "not known to the trial judge" at the time of sentencing, that this information was "not then in existence," or that it was "unknowingly overlooked."  *Rosado*, 70 Wis. 2d at 288; *see also Harbor*, 333 Wis. 2d 53, ¶58 & n.12 (concluding that the "additional and more expansive knowledge of the defendant's mental health issues" presented after sentencing did not constitute a new factor); *Krueger*, 119 Wis. 2d 327, 335, 351 N.W.2d 738 (Ct. App. 1984) (concluding that the defendant was not entitled to modification because "the so-called 'new factor' was, in fact, known to the trial judge at the time of sentencing").

---

[9] *See State v. Gallion*, 2004 WI 42, ¶¶40-41, ¶43 n.11, 270 Wis. 2d 535, 678 N.W.2d 197 (identifying numerous sentencing objectives and factors that circuit courts should consider under the appropriate circumstances of each case, including the rehabilitative needs of the defendant).

¶57     Ostrum does not cite any authority to support the proposition that a subsequent diagnosis that confirms disorders that the court accounted for during sentencing constitutes a new factor under Wisconsin law.  Nor does he cite any authority for the proposition that a post-sentencing exacerbation of health conditions resulting from confinement constitutes a new factor.  *See State v. Pettit*, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992) (we need not consider arguments that are unsupported by adequate legal citations).  Accordingly, we conclude that Ostrum has not met his burden to demonstrate the existence of a new factor by clear and convincing evidence.  *See Harbor*, 333 Wis. 2d 53, ¶36.

## B.  Unduly Harsh

¶58     Circuit courts also have inherent authority to modify a sentence if the court determines that it is "unduly harsh or unconscionable."  *Harbor*, 333 Wis. 2d 53, ¶35 n.8.[10]  A sentence is unduly harsh if it is "'so excessive and unusual and so disproportionate to the offense committed as to shock public sentiment and violate the judgment of reasonable people concerning what is right and proper under the circumstances.'"  *State v. Davis*, 2005 WI App 98, ¶15, 281 Wis. 2d 118, 698 N.W.2d 823 (quoted source omitted).  In determining whether a defendant is entitled to a modification, we review the circuit court's sentence for an erroneous exercise of discretion.  *State v. Scaccio*, 2000 WI App 265, ¶17, 240 Wis. 2d 95, 622 N.W.2d 449.  "When the exercise of discretion has been

---

[10] Typically, we would review a circuit court's determination about whether a sentence was unduly harsh for an erroneous exercise of discretion.  *State v. Grindemann*, 2002 WI App 106, ¶30, 255 Wis. 2d 632, 648 N.W.2d 507.  Here, however, Ostrum did not unambiguously present this issue in his postconviction motion, and therefore, there is no circuit court determination to review.  Although we question whether the issue was preserved under WIS. STAT. § 974.02(2), we will briefly address it because the State has not argued that Ostrum forfeited it by failing to present it in his postconviction motion.

demonstrated, we follow a consistent and strong policy against interference with the discretion of the [circuit] court in passing sentence ....” ***State v. Stenzel***, 2004 WI App 181, ¶7, 276 Wis. 2d 224, 231, 688 N.W.2d 20. “A sentence well within the limits of the maximum sentence is unlikely to be unduly harsh ….” ***Scaccio***, 240 Wis. 2d 95, ¶18.

¶59 Ostrum does little to demonstrate that his sentence was unduly harsh or unconscionable. He points to his reported mental health disorders, particularly anxiety and autism spectrum disorder, and argues that they could have helped explain why he absconded to California. Additionally, Ostrum points out that WIS. STAT. § 948.02(1)(e) criminalizes a wide range of criminal conduct, from touching to intercourse and a “host of factual scenarios in between.” He argues that nine years of initial confinement is unduly harsh “considering the conduct that formed the basis for [Ostrum’s] conviction relative to other conduct” that falls under § 948.02(1)(e).

¶60 We conclude that the circuit court did not erroneously exercise its discretion at sentencing. The record reflects that the court considered Ostrum’s mental health and the relative gravity of Ostrum’s conduct as compared to other offenses, and, after noting those considerations among others, the court gave a sentence that was well below the maximum penalty for violations of WIS. STAT. § 948.02(1)(e). The sentence the court gave to Ostrum does not “shock the public sentiment,” nor does it violate “‘the judgment of reasonable people concerning what is right and proper.’” ***Davis***, 281 Wis. 2d 118, ¶15 (quoted source omitted). Ostrum may posit that the court should have given more weight to certain mitigating factors, but the weight given to relevant factors is particularly within the discretion of a sentencing court. ***Id.***, ¶13. Ostrum’s sentence is not rendered

unduly harsh as a result of his disagreement with the weight the court gave to these pertinent considerations.

¶61 Based on this conclusion, and our conclusion that Ostrum has not presented a new factor, we reject Ostrum's assertion that his sentence should be modified.

## CONCLUSION

¶62 For all the foregoing reasons, we reject Ostrum's arguments and affirm the judgment of conviction and the order denying his postconviction motion.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.